**COMPETITIVE AUTO RAMP SERVICES, INC.,**
Appellant,

v.

**KENTUCKY UNEMPLOYMENT INSURANCE COMMISSION and Kentucky Division of Unemployment Insurance, Appellees.**

No. 2005–CA–001952–MR.

Court of Appeals of Kentucky.

April 27, 2007.

Timothy G. Hatfield, Wyatt, Tarrant & Combs, LLP, Louisville, KY, for appellant.

Amy Peabody, Education Cabinet, Office of Legal Services, Frankfort, KY, for appellees.

Before THOMPSON and WINE, JUDGES; KNOPF,[1] Senior Judge.

## OPINION

THOMPSON, Judge.

The Kentucky Unemployment Insurance Commission found Competitive Auto Ramp Services, Inc. (CARS) to be a successor employer of Shelbyville Mixing Center, Inc. (Shelbyville) under KRS 341.540 and, as a result, liable for Shelbyville's reserve unemployment account and subject to its tax rates.

CARS operates the Shelbyville Mixing Center, a facility located in Shelby County, Kentucky, where railroad cars are loaded and unloaded. Prior to August 2002, Shelbyville operated the facility pursuant to its contract with the facility owner, Norfolk Southern Railway Company (Norfolk). Norfolk, which owned the building, rail yard and the cars loaded and unloaded, contracted out the performance of the work. Shelbyville's contract with Norfolk was to expire on August 25, 2002, so in the summer of that year, Norfolk began re-

---

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

ceiving bids. In addition to Shelbyville, CARS submitted its bid and eventually won the Norfolk contract.

On August 26, 2002, at 12:01 a.m., CARS took over the duties previously performed by Shelbyville. A few months later, a Division of Unemployment Insurance auditor, Melissa Beasley, received a delinquent report assignment on Shelbyville and, upon inquiry, learned that: (1) CARS was operating the facility; (2) CARS performed the same work duties as did Shelbyville; (3) CARS operated from the same facility as did Shelbyville; (4) there was no interruption in the operation of the business through the bidding process and takeover of the operation by CARS; and (5) CARS employed approximately 98% of Shelbyville's employees. Based on these facts, she notified CARS that it was the successor to Shelbyville and, if the Division was unable to collect the amounts owed from Shelbyville, CARS would be liable. CARS was informed that Shelbyville owed the division $196,106 in taxes, $61,540.17 in tax interest, $903.88 in SCUF[2] and $379.63 in SCUF interest. After CARS applied for review by the Commission from the Division's determination that it was a successor employer, the Commission ordered that a hearing be conducted. Following the hearing, the Commission issued an order affirming. It ruled that negotiations occurred to bring about the transfer of business from Shelbyville to CARS, indirectly and through a third party intermediary, Norfolk Southern. CARS' application for reconsideration was denied and it appealed to the Franklin Circuit Court which affirmed the Commission. This appeal followed.[3]

There is no dispute that CARS began its business operations at the same facility that Shelbyville had operated under the Norfolk contract and that it hired most of Shelbyville's employees. The facility, however, is owned by Norfolk as are the rail cars that are utilized in the work. Ricky Harrell, CARS president, testified that his company has absolutely no connection with Shelbyville and no conversation or negotiations ever occurred between CARS and Shelbyville. There was no agreement, assignment of rights or liabilities, or transfer of assets between the two companies.

Although CARS hired the majority of Shelbyville's workforce, the hirings were not the result of negotiations between it and Shelbyville but between CARS and the employees' union, Teamsters Union Local # 89. Kelly Prewitt, Director of Operations for CARS, explained that he negotiated the contract with the union. The decision to hire union employees, he explained, was to address Norfolk's concerns that any union conflicts be avoided. However, CARS did not assume Shelbyville's collective bargaining agreement but negotiated an entirely new contract containing new attendance policies, work and safety rules and benefit packages. All of the employees were required to go through an interview process and background check.

The Division failed to produce any evidence to contradict CARS' evidence. In fact, Auditor Beasley testified that there was no evidence that CARS was legally obligated to recognize Teamsters Union Local # 89. Moreover, she admitted that there was no evidence that there was any business relationship or agreement between CARS and Shelbyville.

CARS contends that, absent any evidence of a connection, negotiation, or transaction between Shelbyville and

2. Service Capacity Upgrade Fund.

3. CARS' motion to transfer its appeal to the Kentucky Supreme Court was denied.

CARS, it cannot be held to be a successor employing unit under KRS 341.540. We agree.

■■■ The scope of review of an administrative action requires that the decision be affirmed if there is substantial evidence of probative value to support the agency's factual findings and if it correctly applied the law to the facts. *Kentucky Unemployment Ins. Commission v. Landmark Community Newspapers of Kentucky, Inc.*, 91 S.W.3d 575 (Ky.2002). Substantial evidence means evidence of substance and relevance sufficient to induce conviction in the minds of reasonable people. *Id.* at 579.

■■■ The issue in this case is whether there is substantial evidence that CARS is a successor employing unit as defined in the applicable statutes and regulations. Even under our limited scope of review, we hold that the evidence is insufficient to support the Commission's decision and reverse.

There are two statutes relevant to this appeal. KRS 341.070(7) includes, as an employer subject to the provisions of the unemployment insurance statute, successor employers:

Any employing unit that succeeds to or acquires the organization, trade, or busi-

ness, or substantially all of the assets of another employing unit which at the time of such succession or acquisition is a subject employer....

At the time that CARS' liability was determined, KRS 341.540(1) provided that:

Any employing unit which succeeds to or acquires the organization, trade, or business of a subject employer shall assume the resources and liabilities of the predecessor's reserve account, including interest, and shall continue the payment of all contributions and interest due under this chapter....

Section 3 of that same statute provided that the contribution tax rates of a successor employer were affected by the predecessor's liabilities and experience.[4]

Through the promulgation of 787 KAR 1:300 § 1, the criteria for a determination of successorship are as follows:

Section 1. Determination of Successorship.

Successorship for nondomestic employers shall be deemed to have occurred between two (2) employing units when the following conditions exist:

(1) Negotiation occurs to bring about the transfer, either directly between the parties to the transfer, or indirectly through a third party intermediary.

(3) Any successor to the trade or business of a subject employer shall assume the resources and liabilities of the predecessor's reserve account, including interest, and shall continue the payment of all contributions and interest due under this chapter, except that the successor shall not be required to assume the liability of any delinquent contributions and interest of a predecessor or predecessors unless the cabinet notifies the successor of the delinquency within six (6) months after the department has notice of the succession.

---

4. Effective June 2005, KRS 341.540 was significantly amended. Subsections 2 and 3 now provide that:

(2) For the purpose of this chapter, if a subject employer transfers all or part of its trade or business to another employing unit, the acquiring employing unit shall be deemed a successor if the transfer is in accordance with administrative regulations promulgated by the secretary, or if the transferring and acquiring employing units have substantially the same ownership, management, or control. If an employing unit is deemed a successor, the transferring employing unit shall be deemed a predecessor.

(2) At least two (2) of the following conditions are met, provided that this condition shall not be satisfied if only paragraphs (c) and (d) of this subsection are met:

(a) The employing unit was a going concern when acquired. For the purpose of this administrative regulation, a going concern shall also include an employing unit which has temporarily ceased subsequent to the date on which negotiations to transfer the employing unit were begun.

(b) The subsequent owner or operator continued or resumed basically the same type of employing unit in the same location.

(c) The subsequent owner employed fifty (50) percent or more of the previous owner's workers in covered employment.

(d) The previous owner employed fifty (50) percent or more of the subsequent owner's workers in covered employment.

(e) The subsequent owner acquired work contracts or commitments from the previous owner.

We have only one published case in this jurisdiction to guide us in our interpretation of the applicable versions of the statutes and the regulation; it is, however, factually similar to this case. In *Wildot, Inc., v. Kentucky Unemployment Ins. Commission,* 762 S.W.2d 17 (Ky.1988), the court reversed a finding of the Commission that Wildot was a successor employing unit pursuant to KRS 341.540. Wildot had negotiated a lease with the owner of the premises on which Zenco Corporation operated a restaurant under the franchise name, "Duff's Smorgasboard." Zenco, which had financial difficulties, ceased operation on the premises the day before Wildot took over the lease and began operating a restaurant also named, "Duff's Smorgasboard." Wildot paid Zenco's debts on the movable restaurant equipment, hired several Zenco employees, and acquired certain inventory from Zenco.

The Supreme Court held that in order to impose liability on Wildot, the plain language of KRS 341.540 and 787 KAR 1:300 requires that there be some "connection, negotiation, or transaction between the parties." *Id.* at 19. Zenco, it emphasized, was not a "going concern" when Wildot commenced business and there was no connection, negotiation or transaction between the parties. "Wildot did not succeed to or acquire anything from Zenco." *Id.* Merely continuing the same business, even in the same location, is not, by itself, sufficient to impose successor liability under the statute. The same reasoning applied in *Wildot* is equally applicable to the present case and requires that the Commission's order be reversed.

The record is devoid of any evidence that there was any "connection, negotiation, or transaction" between CARS and Shelbyville. Although CARS went through a bidding process with Norfolk, its sole purpose was for CARS to obtain a new contract. Shelbyville's contract was about to expire so that, just as in *Wildot,* there was nothing for CARS to succeed to or acquire from Shelbyville. There was no transfer, either directly or indirectly, of either Shelbyville's business or its assets to CARS.

In short, there was no discussion or intent to transfer any of the benefits or burdens of Shelbyville's business operation from Shelbyville to CARS. In *Mascom Management, Inc. v. Labor and Industrial Relations Commission,* 586 S.W.2d 802 (Mo.App. W.D.1979), applying Missouri's successor employer statute for unemployment tax contribution purposes, the court held that the absence of the assumption of

the burdens of the prior operation and the prospective benefits by the new lessee of a business property, precluded a finding of successor liability. Based on facts similar to the present case, we find that court's rationale persuasive:

> What has occurred in the instant case is that a new enterprise has been undertaken with fresh assets to operate a similar business in the same location. This has had the effect of continuing the employment of the employees of the old enterprise, but that salutary end should not be burdened by saddling the new enterprise with the debts of the old enterprise. It is obvious from the factual background of this case that if a new entrepreneur entering the picture was concerned that a deficiency would be imposed, it would be relatively simple to defeat the claim of the state by interrupting the operation so as to avoid there being a continuous operation. The only losers in that situation would be the employees, whose employment would be lost, and the Industrial Commission due to benefits for unemployment that would accrue to those employees. *Id.* at 807.

In this case, CARS is suffering the consequences of Shelbyville's past delinquent contributions, yet it did not reap any of the benefits of the prior business nor did it assume its liabilities. For all purposes, when Shelbyville's contract with Norfolk ended, CARS began a new and separate business; CARS, however, because it operated the business without interruption, on the same premises, and it employed Shelbyville's employees, faces significant liability. We agree with the court in *Mascom,* that this reasoning does not serve the purpose of providing unemployment compensation but discourages employers from employing dislodged workers. In the absence of evidence that there was a connection, negotiation, or transaction between the two employing units, as a matter of law, there can be no successor liability.

Since there is no evidence, either directly or indirectly, to support the Commission's finding that there was any connection, negotiation, or transaction between CARS and Shelbyville, we do not address the Commission's interpretation of the criteria set forth in 787 KAR 1:300.

The opinion and order of the Franklin Circuit Court is reversed.

ALL CONCUR.