**KENTUCKY SOUTHERN COAL CORPORATION, Appellant**

v.

**KENTUCKY ENERGY AND ENVIRONMENT CABINET (Formerly the Environmental and Public Protection Cabinet), Appellee.**

No. 2010–SC–000029–DG.

Supreme Court of Kentucky.

April 25, 2013.

Sam Preston Burchett, Lexington, KY, counsel for appellant.

Tamara Janell Patrick, Office of General Counsel, Frankfort, KY, counsel for appellee.

Opinion of the Court by Chief Justice MINTON.

The Kentucky Energy and Environment Cabinet denied Kentucky Southern Coal Corporation's application to renew its surface and underground coal mining permit because a bona fide dispute existed over KSCC's right of entry to 18.1 acres within the permit boundaries. The Court of Appeals affirmed the trial court, which held that the Cabinet properly denied KSCC's renewal application. We agree that a bona fide property dispute exists, which the Cabinet had no legal authority to adjudicate. So we affirm the Court of Appeals because the Cabinet did not err in denying KSCC's renewal permit.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

KSCC holds a Surface Coal Mining and Reclamation Permit over 293 acres in Kentucky, including the 18.1–acre tract of land at issue in this case. KSCC's predecessor in interest, Norton Coal Mining Company, conveyed the surface estate of the 18.1 acres by deed to Walter Crick in 1936. The deed contained the following mineral reservation in favor of Norton:

> But there is nevertheless reserved and excepted from all lands hereby conveyed all the coal and other minerals and the mining and mineral rights and privileges, the right of subjacent support,

and the rights of way for manways, air shafts, drainage shafts, drains, pipe lines, power lines, railroad and [r]ailroad switches as may be convenient or necessary for the working or development or [sic] of the Norton [c]oal [m]ines.

Crick later conveyed the surface estate to Harold and Georgia Bandy, and Norton obtained the reserved mineral estate. In December 1984, the original mining permit was issued to Norton for 29.3 acres of area mining, plus additional acreage for topsoil storage, sediment basin, and a coal-haul road, for a total of 33.1 acres of surface disturbance and 250 acres of underground mining. The 18.1–acre tract was included in the permit boundaries but could not be disturbed because it was not bonded.

Around this time, a dispute arose in which the Bandys contested Norton's right under the Crick deed to mine the property. Norton brought suit in the Hopkins Circuit Court to quiet title to its mineral estate.[1] In 1985, that court entered a judgment finding that the reservation contained in the Crick deed was effective as to the 18.1 acres. The court declared Norton "the owner of the coal and mining rights . . . in and underlying the tract of land, the surface of which is owned by" the Bandys.

The judgment also granted Norton a 15–year surface lease for the Bandy property, effective January 23, 1985. Norton paid the Bandys $27,500 for the lease, which provided Norton "the right to strip mine the property and perform any mining or associated operations thereon not prohibit-

ed by this Judgment or state or federal law. . . ." At the end of the 15–year lease, Norton was to return the leasehold to the Bandys reclaimed in accordance with state and federal regulations.

In May 1990, five years after entry of the judgment, KSCC acquired Norton's rights in the lease over the 18.1–acre tract. Norton transferred the mining permit to KSCC; and KSCC placed the 18.1 acres under a performance bond, ensuring its reclamation.[2] KSCC's current permit includes 293 acres, of which 43 acres are surface-disturbance acres and 250 acres overlie underground operations.[3] The 18.1–acre tract is a means of egress and ingress to the underground works for KSCC's mining permit. It also includes around 17 acres of area mining and the highwall[4] for the faceup to the underground mine. There is disagreement about whether the tract has been subject to surface mining operations.

In 1995, the Bandys conveyed the disputed property to Jeff and Marion Reynolds. And, in 2004, the Reynoldses conveyed the 18.1–acre tract to the current owner, Cathy Gunn.[5] The surface-mining lease on the property expired at the end of the original 15–year term in January 2000 and has not been renewed.

Around late 1999 or early 2000, KSCC filed an application with the Cabinet to renew its Surface Coal Mining and Reclamation Permit for another five years. The permit is a combination underground and surface mining permit. While the applica-

1. *Norton Coal Corporation v. Bandy,* Civil Action No. 84–CI–00339.

2. After KSCC acquired the permit, additional surface disturbance was added, minor revisions were issued, and a second transfer of the permit was made to KSCC in May 2000.

3. KSCC's permit has now been amended to suspend mining operations.

4. 405 Kentucky Administrative Regulations (KAR) 16:001(44) defines *highwall* as "the face of exposed overburden and coal in an open cut of a surface mining activity or for entry to underground mining activities."

5. Gunn is not a party to any action involving the property and is not before the Court in this case.

tion was pending, the Cabinet's Division of Mine Permits received a protest letter from the Reynoldses claiming the 1985 surface lease between the Bandys and Norton Coal had expired and that a renewal lease had not been negotiated. KSCC did not present any further documentation of a new lease agreement and did not claim a right to enter and mine without the Reynoldses' consent. So the Division denied KSCC's mining license renewal application because KSCC did not prove that it had a legal right of entry and because KSCC failed diligently to pursue issuance of the renewal. KSCC then filed an amended petition, arguing for the first time that the 15–year lease applied only to strip mining and that its right of entry was based upon the terms of its broad form mineral deed and did not require consent of the surface owners.

The Division again concluded that the permit renewal should be denied because there was a bona fide dispute about KSCC's right of entry to the surface. The dispute was submitted to the Cabinet's hearing officer, who concluded by summary disposition that the Division properly denied KSCC's permit renewal application because a bona fide dispute existed. The hearing officer concluded that the Hopkins Circuit Court judgment ruled that Norton owned the minerals underlying the tract of land and "went a step further and also made a determination, based upon the agreement of the parties, as to the manner in which Norton, and later, [KSCC], would have a right of entry to the surface." The Secretary of the Cabinet issued a final order adopting the hearing officer's recommendation and affirming the Division's denial of the permit renewal.

KSCC sought review of the Secretary's order in the Franklin Circuit Court, which affirmed the Cabinet's decision. That court found that the expiration of the surface lease adjudicated by the Hopkins Circuit Court creates a bona fide dispute over the rights of KSCC to mine the coal on the 18.1–acre tract. The Court of Appeals also affirmed the Cabinet's decision. We granted discretionary review of the case, and we now affirm.

## II. ANALYSIS.

■■■ We use the substantial evidence standard of review for an administrative agency's findings of facts.[6] "[I]f there is substantial evidence in the record to support an agency's findings, the findings will be upheld, even though there may be conflicting evidence in the record."[7] "If the findings of fact are supported by substantial evidence of probative value, then they must be accepted as binding[;] and it must then be determined whether or not the administrative agency has applied the correct rule of law to the facts so found."[8] "When the facts are in dispute and the findings of fact by an administrative board are supported by substantial evidence, and the board [has] applied the correct rule of law to the facts so found, its final order must be affirmed."[9]

### A. A Bona Fide Dispute Exists Regarding KSCC's Right of Entry to the 18.1–Acre Tract.

Kentucky Revised Statutes (KRS) 350.060(13) provides that "[a]ny valid per-

6. *Kentucky Unemployment Ins. Comm'n v. Landmark Community Newspapers of Kentucky, Inc.,* 91 S.W.3d 575, 578 (Ky.2002).

7. *Kentucky Comm'n on Human Rights v. Fraser,* 625 S.W.2d 852, 856 (Ky.1981) (citations omitted).

8. *Landmark Community Newspapers,* 91 S.W.3d at 578, *quoting Southern Bell Tel. & Tel. Co. v. Kentucky Unemployment Ins. Comm'n,* 437 S.W.2d 775, 778 (Ky.1969).

9. *Brown Hotel Co. v. Edwards,* 365 S.W.2d 299, 302 (Ky.1962).

mit issued pursuant to this chapter shall carry with it the right of successive renewal upon expiration with respect to areas within the boundaries of the existing permit." The Cabinet must issue the permit renewal unless, among other requirements, "[t]he terms and conditions of the existing permit are not being satisfactorily met."[10] A mining permit will not be issued if the applicant cannot show that it has a legal right to enter and mine the land within the permit area.[11] If an applicant no longer has a legal right of entry onto land within a permit, then the terms and conditions of the existing permit are not met; and the Cabinet cannot issue the permit renewal.[12]

When a bona fide dispute exists regarding an applicant's legal right of entry, the Cabinet cannot grant a permit renewal. The property dispute regarding the applicant's right of entry must be adjudicated in the court of general jurisdiction in which the real estate is located, not in administrative proceedings held by the Cabinet.[13] The Cabinet is prohibited from adjudicating property rights.[14] And while the existence of pending civil litigation concerning an applicant's right of entry has bearing on whether a bona fide property dispute exists,[15] pending litigation is not

necessary for the Cabinet to determine that a bona fide dispute exists. The question in this case is whether a bona fide dispute exists regarding KSCC's right of entry to the 18.1 acres, such that the Cabinet properly denied KSCC's permit renewal application.

KSCC claims that the permit it is seeking to renew concerns deep mining only, not surface mining; and the surface disturbance allowance on the 18.1 acres is for the surface disturbance associated with deep mining, including ingress and egress to the underground mine. Based on this premise, KSCC argues that it has a prima facia right of entry to mine its mineral estate because it owns the mineral rights for deep mining under the Crick deed.[16] Alternatively, KSCC argues that because it owns the mineral rights, it also holds the right to extract the minerals by both surface mining and underground mining.

Regardless of whether the Crick deed granted the right of entry for deep mining or surface mining, the Hopkins Circuit Court judgment created a bona fide dispute regarding KSCC's right to enter the 18.1–acre tract. The judgment first declares Norton the owner of the coal and

10. KRS 350.060(13)(a).

11. *See* 405 KAR 8:030 § 4(1) and (2); KRS 350.060(3)(d) (A company "desiring a permit to engage in surface coal mining operations shall file an application," stating the "source of the applicant's legal right to mine the coal on the land affected by the permit[.]").

12. *See also* KRS 350.085(1) ("No application for a permit and no operation shall be approved or allowed by the [C]abinet if ... the requirements of this chapter or administrative regulations will not be observed....").

13. KRS 452.400.

14. *Dep. for Nat. Res. and Envt'l Protection v. Stearns Coal & Lumber Co.*, 563 S.W.2d 471, 473 (Ky.1978).

15. *See* 405 KAR 8:030 § 4(1) ("Each application shall contain a description of the documents upon which the applicant bases his or her legal right to enter and begin surface mining activities in the permit area and whether that right is the subject of pending litigation.").

16. KSCC argues that under Kentucky constitutional, statutory, and common law, the mineral estate is dominant over the surface estate; and the surface owner holds the land in trust for the owner of the mineral estate. The company also argues that the Crick deed was a broad-form deed that contained references to strip mining the property.

mining rights in and underlying the tract of land. Upon agreement of Norton and the Bandys, the judgment then delineates the terms of a 15–year surface lease. The lease terms are not clearly limited to surface mining operations but could reasonably be interpreted to affect Norton's right of entry to its underground mining operation.

The lease granted Norton the right to "strip mine the property *and perform any mining or associated operation thereon* ... subject to the terms and conditions herein stated." [17] Norton agreed to pay the Bandys $27,500 in exchange for the Bandys' release of any future claims arising out of Norton's use of the leased land, including Norton's underground mining operations. The Bandys also agreed not to protest or object to Norton's surface permit on the 18.1 acres and Norton's underground coal mining permit "relating to the underground coal mine to be constructed on the Bandys' leasehold." And Norton was to receive immediate access to the leased area, which suggests that Norton did not previously have unrestricted access to the land.

The surface lease also required Norton to conduct its underground mining operations in certain ways. Norton agreed not to mine coal beneath the Bandy residences and a cemetery and agreed to leave suffi-cient pillars in place to protect the Bandy residences from subsidence.[18]

And, at the end of the 15–year term, Norton was to return the leasehold to the Bandys reclaimed. The record shows that a 40–foot–deep, water-filled pit that provides access to the underground mining operation is currently located on the property.[19] Arguably, the surface lease would require the entire leasehold, including the surface disturbance associated with access to the underground mine, to be reclaimed at the end of the leasehold.

Whatever right of entry KSCC may have had under the Crick deed, the. Hopkins Circuit Court judgment became the law of the case, binding on Norton's successors. The 15–year surface lease provided for in the judgment creates a bona fide dispute about KSCC's right of entry after expiration of the surface lease. The Cabinet was not authorized to adjudicate this property dispute. It is within the Hopkins Circuit Court's jurisdiction to determine the rights granted by the Crick deed and the effect the judgment had on those rights.[20]

Furthermore, despite KSCC's assertions to the contrary, KSCC is seeking to renew a permit that allows surface mining on the 18.1–acre tract. KSCC submitted an application to the Cabinet to renew its mining permit as it existed.[21] The existing

---

17.  Emphasis added.

18.  The dissent explains in some detail that the surface mining lease was necessary because, otherwise, KRS 381.940 would not allow surface mining under the Crick deed. But this does not alter the fact that the lease also addressed Norton's deep mining operations.

19.  The dissent concurs with the fact that the pit provided deep mine access.

20.  The dissent may very well be correct that the Hopkins Circuit Court judgment, and the 15–year lease created in it, does not hinder

KSCC's right of access to its deep mining operations. But that is not the real question before this Court. Rather, the issue before us is whether the Cabinet correctly determined that a bona fide dispute exists such that it could not issue a permit renewal. We hold simply that the Hopkins Circuit Court, not the Cabinet, has jurisdiction to determine whether KSCC has a right of access to its underground mining operations.

21.  *See* 405 KAR 8:010 § 21(4) ("An application for renewal shall not include any proposed revisions to the permit. Revisions shall be made by separate application and shall be

permit granted both underground mining and area mining on the 18.1–acre tract.[22] Substantial evidence in the record supports the hearing officer's finding that of the 18.1 acres, 17.2 acres were designated for area mining.[23] But, according to the lease provided for in the Hopkins Circuit Court judgment, the 15–year lease for surface mining expired in 2000.

So KSCC is seeking to renew a permit that would allow surface mining on the 18.1 acres when the surface lease that granted the right to strip mine has expired.[24] To the extent that KSCC claims it has a right to surface mine the land by virtue of the Crick deed, the final judgment places that issue in dispute. KSCC has not shown a right of entry necessary for the permit, which includes area mining on the 18.1–acre tract.

KSCC complains that the Cabinet adjudicated its property rights by finding ambiguity in the Hopkins Circuit Court judgment and denying that the company has a prima facie right of entry based on its ownership of the mineral estate. But the opposite is true. The Cabinet determined, and this Court agrees, that it is uncertain whether KSCC has a legal right of entry onto the land. Without having a clear right of entry, the Cabinet was prohibited

from issuing a permit renewal because the terms and conditions of the existing permit were not being satisfactorily met. It is KSCC's obligation, as the permit applicant, to resolve the property dispute issue before applying for a permit renewal.

**B. It is Irrelevant that the New Surface Owner has not Intervened in the Administrative Proceedings.**

When KSCC first sought to renew its mining permit, the Reynoldses owned the disputed 18.1 acres. They filed a protest letter with the Cabinet and intervened in the administrative proceedings. But, in 2004, the Reynoldses conveyed the 18.1–acre tract to the current owner, Cathy Gunn. Gunn did not intervene in the administrative proceedings and has not raised a property dispute. So KSCC argues that there is no bona fide property dispute because the current owner has not objected to the company's permit renewal application. We disagree.

■ The Reynoldses' current absence from the proceedings and Gunn's failure to intervene in the permit renewal process are irrelevant. The Reynoldses were not required to intervene in the administrative

---

subject to the requirements of Section 20 of this administrative regulation.").

**22.** Although not defined in the KAR, area mining is a type of surface mining. "Area mining is carried on where the terrain is flat or gently rolling. In this process, coal is dug out in a series of trenches parallel to each other. As each trench is completed, the earth removed from the neighboring cut is dumped into the previous cut. As the backfill settles, the area takes on a corrugated appearance[;] and since there is no available earth to fill the last trench, there remains a high wall with a ditch in front of it." THE SUPREME COURT REJECTS CONSTITUTIONAL CHALLENGES TO THE SURFACE MINING CONTROL AND RECLAMATION ACT OF 1977 HODEL v. VIRGINIA SURFACE MINING AND RECLAMA-

TION ASSOCIATION HODEL v. INDIANA, 48 Brook. L.Rev. 137, 175 (Anthony Pye Fall 1981).

**23.** The permit granted in 1984 stated, "[t]he Division of Permits hereby grants the above-named operator a permit to engage in surface coal mining and reclamation operations." And various mining maps prepared in 1994 show area mining on a portion of the 18.1–acre tract. Contrary to the dissent's claim, we are not conflating the highwall necessary for accessing the deep mining operations with strip mining.

**24.** And we note that nothing in the record suggests that the current owner of the property has signed a waiver or executed a lease or deed in favor of KSCC.

proceedings.[25] By filing the dispute letter and choosing to intervene in the proceedings, the Reynoldses brought the property dispute to the Cabinet's attention. The Cabinet cannot issue a permit renewal if the terms and conditions of the existing permit are not being satisfactorily met.[26] So once the Cabinet was aware of the bona fide dispute over KSCC's legal right of entry to the 18.1–acre tract, it was not free to issue the permit. And nothing in the record suggests that Gunn has signed a waiver or executed a lease or deed in favor of KSCC. So the fact that the Reynoldses sold the property and Gunn has not chosen to intervene does not change the dispute regarding KSCC's right of entry to the property.

### III. CONCLUSION.

The question presented to the Court in this case is simply whether a bona fide dispute exists regarding KSCC's right to enter the disputed 18.1 acres. We find that a bona fide dispute exists because (1) the Hopkins Circuit Court judgment could reasonably be interpreted to affect KSCC's right of entry to access its underground mine, and (2) KSCC is seeking to renew a permit that allows surface mining on the 18.1 acres when the surface lease established by the Hopkins Circuit Court judgment has expired. Substantial evidence in the record supports the Cabinet's findings, and the Cabinet applied the correct rule of law to those facts. Accordingly, we affirm the decision of the Court of Appeals, which upheld the Cabinet's final order.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., sitting. ABRAMSON, CUNNINGHAM, and NOBLE, concur. SCOTT, J., dissents by separate opinion in which VENTERS, J., joins. KELLER, J., not sitting.

SCOTT, J., dissenting:

I must respectfully dissent as I am perplexed as to how the majority can conflate deep mining with surface mining and then create a "bona fide property dispute" based solely upon an "expired" 18.1 acre surface mining lease necessary only for surface mining as per KRS 381.940, later § 19(2) of the Kentucky Constitution.[27] In

25. 405 KAR 7:091 § 10(1) ("A person may petition in writing for leave to intervene at any stage of a proceeding. . . .").

26. KRS 350.060(13)(a).

27. KRS 381.940, effective July 13, 1984, read:

In any instrument heretofore or hereafter executed purporting to sever the surface and mineral estates or to grant a mineral estate or to grant a right to extract minerals, which fails to state or describe in express and specific terms the method of coal extraction to be employed, or where said instrument contains language subordinating the surface estate to the mineral estate, it shall be held, in the absence of clear and convincing evidence to the contrary, *that the intention of the parties to the instrument was that the coal be extracted only by the method or methods of commercial coal ex-traction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed, and that the mineral estate be dominant to the surface estate only for the purposes of coal extraction by the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed.*

(Emphasis added.) We held this statute unconstitutional in *Akers v. Baldwin,* 736 S.W.2d 294 (Ky.1987) as a legislative usurpation of judicial rights. However, our decision was superseded to an extent when the Kentucky Constitution was amended in 1988 to replace the invalidated statute. Section 19(2) of the Kentucky Constitution, approved November 8, 1988, reads:

In any instrument heretofore or hereafter executed purporting to sever the surface and mineral estates or to grant a mineral estate or to grant a right to extract miner-

fact, § 19(2) of the Kentucky Constitution specifically provides, in regard to the deep mining permit renewal sought here, "that the mineral estate be dominant to the surface estate for the purposes of coal extraction by ... the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed."

Not one of the majority would dispute that underground or deep mining was commonly known in all of Kentucky on the date of the coal severance deed involved here in September of 1936;[28] neither do I suspect that any of the majority would question the relevancy of the surface mining lease granted by Judge Spain in his agreed resolution of the parties' mineral ownership and surface mining rights litigation in Hopkins Circuit Court in March of 1985[29] to the right to deep mine the same coal. " 'Strip mining' means the breaking of the surface soil in order to facilitate or accomplish the extraction or removal of minerals ...; but shall not include ... the surface effects or surface impacts of underground coal mining." KRS 350.010(2).

In underground mining, access is facilitated to the coal seam for entry by cutting a highwall either into the hillside, if the coal seam is above drainage (above the creek), or by cutting a pit or sloped entry into the valley if the coal lies under drainage (under the creek level). These cuts have to be sufficient to create a reasonably sheer and safe highwall around and above the deep mine entries into the coal seam (generally three or four) so as to lessen the risk of the falling of loose rock upon the miners as they enter and leave the mine mouth. This mining activity, necessary to access and face up a deep mine for entries into the vein of coal, has never—to this date—been held to be "strip mining" for purposes of KRS 381.940, or its successor, § 19(2) of the Kentucky Constitution. *See Hazard Coal Corp. v. Knight,* 325 S.W.3d 290, 300, n. 7 (Ky.2010) " 'Section 19(2) was intended and should be applied herein only to prohibit strip mining operations conducted pursuant to broad form deeds in the absence of the surface owner's consent.' " (*quoting Karst–Robbins Coal Company, Inc. v. Arch of Kentucky, Inc.,* 964 S.W.2d 419, 425 (Ky.App.1997)).

als, which fails to state or describe in express and specific terms the method of coal extraction to be employed, or where said instrument contains language subordinating the surface estate to the mineral estate, it shall be held, in the absence of clear and convincing evidence to the contrary, *that the intention of the parties to the instrument was that the coal be extracted only by the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed, and that the mineral estate be dominant to the surface estate for the purposes of coal extraction by only the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed.*
(Emphasis added.) How such an agreement would be relevant to a mineral owner's deep

mining rights under its coal severance deed, however, is another question.

**28.** In fact, just two years after coal was discovered in the United States, Dr. Thomas Walker discovered coal on one of his first trips into eastern Kentucky in 1750 and used it for a campfire. Seventy years later, in 1820, the first commercial coal mine opened in western Kentucky. It was not until 1900 that coal was mined commercially in eastern Kentucky. *http://en.wikipedia.org/wiki/coal_mining_in_kentucky* (last visited April 5, 2013).

**29.** Judge Spain was well aware of the legal differences between deep mining and strip mining, as he was one of the majority of four in *Ward v. Harding,* 860 S.W.2d 280 (Ky.1993) that upheld § 19(2) of the Kentucky Constitution against challenges.

And, never before has a Kentucky court of this stature required a mineral owner to secure the written permission of the surface owner, that is to pay, to access its coal reserves under that tract for deep mining purposes. To the contrary, the rule as to deep mining has always been:

> The owner of mineral has of course the right to remove the same, and a grant or reservation of minerals carries with it as incidents a right to open a mine by sinking shafts, and the right to use such lands as are necessary in getting out and removing the minerals, and generally to employ all the necessary appliances requisite to the proper working of the mines.

*Imperial Elkhorn Coal Co. v. Webb,* 190 Ky. 41, 225 S.W. 1077 (1920); *see also Wiser Oil Co. v. Conley,* 346 S.W.2d 718, 721 (Ky.1960) ("There is a sound basis for the rule that a deed or lease of minerals carries with it the right to use as much of the surface, or other property, as may be reasonably necessary to exploit the minerals."); *Wells v. N.E. Coal Co.,* 255 Ky. 63, 72 S.W.2d 745 (1934); *Case v. Elk Horn Coal Corp.,* 210 Ky. 700, 276 S.W. 573 (1925); *Himler Coal Co. v. Kirk,* 205 Ky. 666, 266 S.W. 355 (1924); *McIntire v. Marian Coal Co.,* 190 Ky. 342, 227 S.W. 298 (1921); *Scott v. Laws,* 185 Ky. 440, 215 S.W. 81 (1919). This, of course, includes sufficient surface distance, space, and access for safe shaft or slope entry, equipment storage and repair, material handling and storage, including coal handling and cleaning facilities, power and telephone lines, roads, bath houses and parking for the miners, and other reasonably necessary structures and uses.

In instances such as this, "[t]he surface covers the mineral estate, and as a result, there is inherent in the mineral estate a right of access in and through the surface to the minerals. Of what value is a mineral if it cannot be mined? The surface owner has no right in the minerals; the mineral estate is therefore considered to be the dominant estate, and the surface estate is the servient one." *Akers,* 736 S.W.2d at 297.

Here, the scope of review for administrative actions requires the decision be affirmed if there is substantial evidence of probative value to support the agency's factual findings and if it correctly applied the law to the facts. *Kentucky Retirement Systems v. Bowens,* 281 S.W.3d 776 (2009); *Competitive Auto Ramp Services, Inc. v. Kentucky Unemployment Ins. Com'n,* 222 S.W.3d 249 (Ky.App.2007). And, as to its findings, as long as there is substantial evidence in the record to support the agency's decision, a reviewing court must defer to the agency, even if there is conflicting evidence. *500 Associates, Inc. v. Nat. Resources and Env. Protection Cabinet,* 204 S.W.3d 121 (Ky.App.2006). The problem here, however, is one of the correct application of law. To check the application of law, we must know the essential facts.

In this instance, the coal and its mining rights were severed from the remainder of the estate by a severance deed dated September 12, 1936. This deed clearly reserved rights against the then-purchaser of the surface, Walter Crick, to recover the coal by a then-known method of removal, i.e., deep mining, ignoring any issue of strip mining, to wit:

> But there is nevertheless reserved and excepted from all lands hereby conveyed all the coal and other mineral and the mining and mineral rights and privileges, the right of subjacent support, and the rights of way for manways, air-shafts, drainage shafts, drains, pipelines, power lines, railroads, and railroad switches as may be convenient or necessary for the working or development of the Norton coal mines.

Years thereafter, a subsequent surface owner, Harold Bandy, came to believe he owned the coal and mining rights as well as the surface. This led to several law suits filed by the then coal owner, Norton Coal Corporation, against the Bandys in 1984—one for adjudication of its mineral ownership of the coal and another for slander of its mineral title.[30] On July 14, 1984, however, KRS 381.940 intervened in the circumstances—restating the rules for construction of mineral deeds in regard to the right to strip mine the surface to remove the coal.[31]

The record reflects the original permit, including Increment Number Two in issue here,[32] was originally issued to Norton Coal on December 17, 1984. It contained the Bandy surface property—later to become the Reynolds property—and contained 17.2 acres of "area mining"[33] along with the highwall necessary for the face up to access approximately 250 acres of underground (deep) mining. Moreover, the hearing officer specifically found that *this Increment Number Two was a means of egress and ingress to the underground (deep) mining works for this permit.* This finding was accepted by the Cabinet in its order ultimately denying renewal of the permit on December 16, 2005.

Going back, however, to the litigation between Norton Coal and the Bandys in the mid–1980s, the matter was ultimately settled by an agreed judgment signed by then Hopkins Circuit Court Judge, Thomas B. Spain, dated March 13, 1985. This

30. The slander of title action was dismissed as part of the agreed settlement.

31. This Court declared KRS 381.940 unconstitutional as an invasion by the legislature of judicial powers in *Akers,* 736 S.W.2d 294. KRS 381.940 was then readopted in November 1988 as § 19(2) of the Kentucky Constitution.

32. Because of the expensive reclamation bonding costs, mining permits are generally divided into increments of projected work. These increments do not have to be bonded until the mining progresses to that geographical section of the permitted area at which time bonds for the projected reclamation costs have to be furnished before surface disturbance begins.

33. Area mining is a method by which box cuts are made on relatively flat land and the overburden removed to get down to the coal seam. If the seam removal is to be by the surface mining method, the seam is removed and the machinery keeps the box moving forward, using the new overburden material removed ahead of it to fill up the box behind it. If it is for access to the coal seam (under drainage, of course) for deep mining purposes, a reasonably safe sloping road (slope mining) is built into the pit for travel and the coal seam is faced up under a reasonably safe highwall on one side of the pit and entry and mining by the deep mine method progresses. If the seam is relatively deep underground, then it is accessed by large straight-down shafts and elevators lower and raise the miners and materials (shaft mining) in and out of the coal seam

Interestingly enough, early in the hearing process and before they withdrew from the fray, the Reynoldses provided the Cabinet with a photograph showing a forty foot deep pit filled with water, still open on the property. This is consistent with the fact that this Increment Number Two *had already been surface mined before* and a box cut left for deep mining entry into the seam. But, this is highly unlikely, since the Cabinet's inspectors had been on the property during its previous operations and have over flight videos of it and the Cabinet *never asserted in the hearing* that it had been surface mined previously by any method. Appellant, however, asserted Increment Number Two had never been surface mined. This, then, would mean the pit was a box cut only for deep mine access. Moreover, had there been previous surface mining on Increment Number Two and reclamation had not been completed, the Cabinet would be fully aware of this and would have issued citations for such failure. Only if the pit *were there for permissive future deep mine access* would they not have issued citations. This is consistent with the hearing officer's findings.

agreed judgment settled the disputes between them, recognized Norton Coal's ownership of the coal, and, as agreed, granted Norton, later Kentucky Southern Coal Corporation, a fifteen year surface lease from the Bandy's sufficient to comply with then-applicable KRS 381.940 and other applicable mining laws[34] aside even assuming that strip mining was not a recognized method of coal recovery in western Kentucky in 1936. *United States v. Stearns Co.*, 595 F.Supp. 808, 811 (E.D.Ky. 1984) ("There also had been strip mining in other distant areas, such as western Kentucky, Ohio and Illinois, before 1937 . . . ."). For this, the Bandys were paid $27,500.

Appellant, Kentucky Southern Coal Corporation, thereafter acquired the mining rights and permit from Norton Coal and in July of 1999 sought a renewal for the permit. The permit's expiration date was scheduled for December 17, 1999. Thereafter, in 2000 the Reynoldses acquired the Bandys' property and—wanting, but not getting another $12,500 for a five-year extension of the surface lease—filed a protest letter to the renewal application asserting Appellant's lack of legal access to Increment Number Two of the permit notwithstanding that neither § 19(2) of the Kentucky Constitution nor *Ward v. Harding*, 860 S.W.2d 280 (Ky.1993) had changed a mineral owner's right to access coal through the surface owner's estate for deep mining purposes.

In point of fact, § 19(2) validates it, to wit: "that the mineral estate be dominant to the surface estate for the purposes of coal extraction by . . . the methods of commercial coal extraction commonly known to be in use in . . . Kentucky in the area affected at the time the instrument was executed." No one disputes that deep mining was prevalent in western Kentucky long before the severance deed in 1936!

Thereafter, notwithstanding that the Reynoldses had withdrawn from the fray following their divorce and sale of the property,[35] on December 16, 2005, the Cabinet, upon recommendation of the hearing officer, adopted his report and findings and denied the permit renewal application on grounds that Kentucky Southern had failed *in its burden* to establish its legal rights to mine the coal under the surface of Increment Number Two—six years after the filing of the application for renewal.

Admittedly, KRS 350.060(3)(d) requires an application for a permit, or renewal, to state "[t]he source of the applicant's legal right to mine the coal on the land affected by the permit." However, KRS 350.060(12) requires that "[t]he cabinet shall recognize the distinct differences between the surface effects of underground mining and strip mining . . . ."

And, contrary to the assertion of the Cabinet, the Franklin Circuit Court, the Court of Appeals, and the majority of this Court that *Appellant bore the burden of proof* here on this application for permit renewal as to its rights to enter upon the

---

**34.** There are multiple large underground seams of coal in Hopkins County, Kentucky which are mined at different times and by different methods (some are slope mined and the very deep ones are shaft mined). Thus, any presumption that a mineral owner—who indisputably has the legal right to enter the surface to deep mine its coal—would trade its rights to access all of its seams for access to only one (which it already has) would be

unreasonable. This should be especially true where the *opponent to the application for renewal* has the burden of proof, as here. KRS 350.060(13).

**35.** Neither did the new owners join the dispute although they were notified by the Cabinet of their consideration of the renewal application on their property.

surface of Increment Number Two, the law is that "[a]ny valid permit issued ... shall carry with it the right of successive renewal upon expiration with respect to areas within the boundaries of the existing permit" and, upon such *an application for renewal,* "the burden shall be on the opponents of [the] renewal" subject to certain findings of the Cabinet. KRS 350.060(13); *see also* 405 KAR 8:010 § 21(6)(a) and (b).[36]

Here, Appellant filed the severance deed under which it indisputably had the rights of entry upon and use of the surface property of Increment Number Two for all reasonable purposes for deep mining. This includes the necessary box cut to get to and face up the coal seam and highwall to mine the 250 acres of deep mining covered by this Increment. It had a valid permit to do so and filed its renewal application prior to the expiration of the original permit. And, on renewal, the burden is on the opponent of the renewal, *not the proponent.*

Moreover, the use of the "expired" surface lease, agreed to by the parties and Circuit Judge Spain as a means of complying with the newly emerging surface mining changes announced under KRS 381.940, to suggest that, under the circumstances, Norton Coal intended to give up its deep mining rights to the property is ingenious at best, but totally improper under the burdens established by law. This is especially true given the disappearance (or failure to appear) of anyone who could be the subject of a disparagement of title suit for the lost value of the coal involved over the fourteen years this matter has trundled through this maze.

All said, it is a clear misapplication of law and thus, I must strongly dissent. I would reverse and remand this matter to the Cabinet to grant the renewal of the permit.[37]

VENTERS, J., joins.

---

**36.** *See also* 30 U.S.C. § 1256(d), which reads: Any valid permit issued pursuant to this chapter shall carry with it the right of successive renewal upon expiration with respect to areas within the boundaries of the existing permit. The holders of the permit may apply for renewal and such renewal *shall be issued* (provided that on application for renewal the burden shall be on the opponents of renewal), subsequent to fulfillment of the public notice requirements ... *unless* it is established that ...

(A) the terms and conditions of the existing permit are not being satisfactorily met....

**37.** I might add, if the Cabinet is really afraid of any other regulatory mining problems with the renewal, it can attach any mining conditions or restrictions to the permit on renewal as are lawful and appropriate. It always does.