RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

M.L. JOHNSON FAMILY PROPERTIES, LLC,

*Plaintiff-Appellant*,

*v.*

DAVID L. BERNHARDT, Secretary of the Interior,

*Defendant-Appellee*,

PREMIER ELKHORN COAL LLC,

*Intervenor-Appellee*.

No. 18-5520

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:16-cv-00006—Karen K. Caldwell, Chief District Judge.

Argued: March 19, 2019

Decided and Filed: May 15, 2019

Before: McKEAGUE, GRIFFIN, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mary Varson Cromer, APPALACHIAN CITIZENS' LAW CENTER, Whitesburg, Kentucky, for Appellant. Corinne Snow, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. **ON BRIEF:** Mary Varson Cromer, APPALACHIAN CITIZENS' LAW CENTER, Whitesburg, Kentucky, Joe F. Childers, JOE F. CHILDERS & ASSOCIATES, Lexington, Kentucky, Walton D. Morris, Jr., MORRIS LAW OFFICE, P.C., Charlottesville, Virginia, for Appellant. Eric Grant, J. David Gunter II, Dustin J. Maghamfar, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. John C. Martin, HOLLAND & HART LLP, Washington, D.C., Thomas C. Means, CROWELL & MORING LLP, Washington, D.C., Charles J. Baird, BAIRD & BAIRD, PSC, Pikeville,

Kentucky, for Intervenor Appellee.  Samuel J. Short, J. Michael West, KENTUCKY ENERGY AND ENVIRONMENT CABINET, Frankfort, Kentucky, for Amicus Curiae.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge.  How to use a large plot of land known as "Tract 46" in Pike County, Kentucky has been a point of contention between the plot's joint owners for quite some time.  The plot's surface and mineral estates have been severed for a century.  Today, the Pike Letcher Land Company and Johnson LLC each own the surface estate as tenants in common.  Pike Letcher also owns the entirety of the coal below.  It wants to mine for the coal.  But Pike Letcher and Johnson don't see eye to eye on how Pike Letcher may use the surface estate to pursue its planned mining activities.

Pike Letcher wants to use the surface to extract the coal using surface mining methods.  To that end, in 2013, Pike Letcher granted Premier Elkhorn Coal LLC, its affiliate, a right to enter the land and commence surface mining.  But Johnson objects to surface mining.  Nonetheless, despite Johnson's protestations, the State of Kentucky granted Elkhorn a surface mining permit, and Elkhorn commenced operations in April 2014.

Johnson has been challenging the validity of Elkhorn's permit ever since—and with some success.  In 2014, as the result of a lawsuit in federal court, the Secretary of the Interior determined that Elkhorn's permit violated federal law.  Elkhorn then remedied the deficiencies in its first permit, and Kentucky issued it an amended permit later the same year.  On review, the Secretary confirmed that, this time, Elkhorn's permit complied with federal law.  Johnson sued again.  An Administrative Law Judge ("ALJ") upheld the Secretary's determination.  The United States District Court for the Eastern District of Kentucky affirmed.  Johnson now appeals.  For the following reasons, we affirm.

## I.

### A.  Legal Background

Coal companies that hope to obtain a permit to surface mine must comply with certain requirements set out by the Surface Mining Control and Reclamation Act of 1977 (SMCRA). SMCRA was designed to "strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001) (citations omitted).  It accomplishes these twin aims through a system that has been described as "cooperative federalism." *Id.*; *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs.*, 746 F.3d 698, 701–02 (6th Cir. 2014) (citation omitted).  Under its cooperative framework, SMCRA sets national minimum requirements for surface mining but invites states to assume responsibility for enforcing them. *Kentuckians for the Commonwealth*, 746 F.3d at 701–02.  States that wish to assume that responsibility must obtain approval from the Secretary by creating their own regulatory program that is "capab[le] of carrying out" SMCRA's provisions.  30 U.S.C. § 1253(a).  Those states may even add to SMCRA's minimum permitting standards, but they must not go below them. *See id.*  Once the Secretary approves a state's program, the state assumes "exclusive jurisdiction" over surface mining activities on non-federal lands within its borders. *Id.*; *In re Permanent Surface Mining Regulation Litig.*, 653 F.2d 514, 519 (D.C. Cir. 1981) (en banc).

The Secretary approved Kentucky's regulatory program in 1982, and the Kentucky Energy and Environment Cabinet has administered the State's program ever since.  30 C.F.R. § 917.10; *see* Ky. Rev. Stat. Ch. 350; 405 Ky. Admin. Regs. Ch. 1–30.  But that did not end the Secretary's involvement with surface mining regulation within Kentucky's borders.  SMCRA vests the Secretary with an ongoing obligation to ensure that state programs comport with the federal Act's minimum requirements.  30 U.S.C. § 1253(a).  In accordance with that oversight authority, whenever the Secretary has reason to believe that a person is in violation of a SMCRA permit condition, and the state authority fails to take action to remedy the suspected violation, the Secretary must inspect the surface mining operation.  30 U.S.C. § 1271(a).  If the Secretary's inspection confirms that a violation is occurring that creates an imminent harm to the health or

safety of the public or the environment, it must issue a cessation order commanding the immediate termination of all surface mining activities. *Id.* § 1271(a)(2); 30 C.F.R. § 843.11(a)(1). Mining without a valid permit is a *per se* imminent harm that automatically triggers the issuance of a cessation order. 30 C.F.R. § 843.11(a)(2).

Whether Elkhorn has a valid SMCRA-compliant permit is the question at the heart of this case. The answer turns on whether Elkhorn has met SMCRA's minimum requirements for establishing a right to surface mine on Tract 46, a severed estate. For its permit to be valid, Elkhorn must have submitted documents to the Kentucky Cabinet that satisfied one of three avenues for establishing a right to surface mine. 30 U.S.C. § 1260(b)(6); 30 C.F.R. § 778.15(b)(3). Those options are:

> (A) the written consent of the surface owner to the extraction of coal by surface mining methods; or
>
> (B) a conveyance that expressly grants or reserves the right to extract the coal by surface mining methods; or
>
> (C) if the conveyance does not expressly grant the right to extract coal by surface mining methods, the surface-subsurface legal relationship shall be determined in accordance with State law . . . .

30 U.S.C. § 1260(b)(6).[1] For ease of reference, we refer to these three statutory provisions as subsections (A), (B), and (C).

Because Elkhorn's current amended permit was issued pursuant to subsection (C), this case turns on the requirements of that subsection. However, prior litigation concerning Elkhorn's permit hinged on the meaning of subsection (A). Because that litigation has some relevance to this one, we discuss it briefly below.

**B. Factual and Procedural Background**

The Kentucky Cabinet initially approved Elkhorn's permit under subsection (A). Because none of the severance conveyances connected to Tract 46 expressly grant a right to

---

[1]Kentucky's SMCRA regulatory analogue contains its own provision that is "substantively identical" to the federal act, 59 Fed. Reg. 27235, 27236 (May 26, 1994) (Director's Finding #4), but it clarifies what documentation an applicant must submit to establish its right to surface mine under each alternative method. *See* 405 Ky. Admin. Regs. 8:030 § 4(2) (2014).

surface mine, Elkhorn relied on a 2013 right of entry agreement between it and Pike Letcher to establish that right.   The Cabinet believed that the right of entry agreement sufficiently documented that Elkhorn had the "consent of the surface owner" to surface mine, as required by subsection (A).  So the Cabinet approved Elkhorn's permit, and Elkhorn began surface mining in April 2014.

That approval spawned the first federal litigation over Elkhorn's permit.  Shortly after Elkhorn commenced mining, Johnson filed a "citizen suit" in the Eastern District of Kentucky, under a SMCRA provision that authorizes private parties to bring suit against the Secretary to "compel compliance" with the Act.  30 U.S.C. § 1270(a).  Johnson alleged that Elkhorn's permit was invalid under SMCRA and thus moved for an injunction ordering Elkhorn to cease mining operations.  *M.L. Johnson Family Props., LLC v. Jewell*, 27 F. Supp. 3d 767, 773 (E.D. Ky. 2014) ("*Johnson I*"), *vacated as moot*, No. 14-5867, Order, R. No. 29-2 (6th Cir. Oct. 31, 2014). The district court agreed with Johnson.  It held that the phrase "the surface owner" in subsection (A) includes "*all* surface owners" who own a parcel as tenants in common.  *Id.* at 771.  Since Elkhorn had only the consent of Pike Letcher, and not Johnson, the court determined that the permit fell short of subsection (A)'s requisites.  Therefore, the court ordered the Secretary to conduct an inspection of Elkhorn's mining operations and enjoined Elkhorn from surface mining while the inspection was pending.[2]  *Id.*

Following the district court's order, the Secretary conducted an inspection.  It found that Elkhorn's permit was invalid under subsection (A) and issued a cessation order prohibiting Elkhorn from continuing to surface mine on Tract 46.  *Id.*

While *Johnson I* was pending and the Secretary was conducting its inspection, Elkhorn was revising its permit application.  Through its revisions, Elkhorn hoped to establish its right to surface mine under subsection (C), which directs "the regulatory authority" to determine "the surface-subsurface legal relationship . . . in accordance with State law."   30 U.S.C. § 1260(b)(6)(C).  Elkhorn resubmitted its right of entry agreement with Pike Letcher along with

---

[2]Elkhorn appealed *Johnson I*, but this court dismissed the appeal as moot and vacated the injunction.  *M.L. Johnson Family Props. v. Premier Elkhorn Coal Co.*, No. 14-5867, Order, R. 29 (6th Cir. Oct. 31, 2014).  The court took "no position on the merits" of the appeal.  *Id.* at 3.  The case remains pending in the district court.

its application. And it directed the Kentucky Cabinet to a Kentucky court of appeals decision, *Johnson v. Envtl. & Pub. Protection Cabinet*, 289 S.W.3d 216, 219–20 (Ky. Ct. App. 2009) ("*Johnson v. Cabinet*"). In that case, the court held that Kentucky's cotenancy laws allowed one surface tenant to surface mine over its cotenants' objections. *Id.* Applying that law, the Cabinet concluded that Elkhorn's right of entry agreement with Pike Letcher, although "from less than all co-owners" of Tract 46, was "sufficient to satisfy the . . . requirements to obtain a mining permit" in accordance with state law. AR 0617. The Cabinet thus issued Elkhorn a new permit to surface mine under subsection (C).

The Secretary then inspected Elkhorn's revised permit and confirmed that the permit complied with subsection (C). Consequently, it terminated the cessation order prohibiting Elkhorn from surface mining.

That termination decision spawned the federal litigation now before us. Johnson administratively challenged the Secretary's termination decision in the Hearings Division of the Department of the Interior's Office of Hearings and Appeals. On October 30, 2015, an ALJ upheld the Secretary's termination decision, concluding that Elkhorn's permit comported with subsection (C)'s requirements. Johnson then administratively appealed the ALJ's decision to the Interior Board of Land Appeals of the Office of Hearings and Appeals ("Appeals Board"). While that appeal was still pending, Johnson also sought review of the ALJ's decision in federal court. The United States District Court for the Eastern District of Kentucky held that the ALJ's decision was not arbitrary or capricious or in violation of law and granted summary judgment in favor of the Secretary, as well as Elkhorn, who had intervened as a defendant in the federal suit.

Johnson now appeals.

## II.

We review the district court's grant of summary judgment de novo but review the agency's decision under the arbitrary-and-capricious standard mandated by SMCRA and the Administrative Procedure Act (APA). *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 457 (6th Cir. 2004) (citation omitted); *see also* 30 U.S.C. § 1276(a)(2) ("Any action subject to judicial review under this subsection shall be affirmed unless the court

concludes that such action is arbitrary, capricious, or otherwise inconsistent with law."). We look only to "the record made before the Secretary," and treat the Secretary's factual findings as conclusive "if supported by substantial evidence on the record considered as a whole." 30 U.S.C. § 1276(b); *see also Appolo Fuels, Inc. v. Babbitt*, 270 F.3d 333, 337 (6th Cir. 2001). Questions of law, however, are considered de novo, giving deference to the agency only for its reasonable interpretation of an ambiguous statute it is charged with administering. *R/T 182, LLC v. FAA*, 519 F.3d 307, 309 (6th Cir. 2008) (citation omitted); *Am. Nuclear Res., Inc. v. U.S. Dep't of Labor*, 134 F.3d 1292, 1294 (6th Cir. 1998) (quoting *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

## III.

Before moving to the merits of Johnson's arguments, we pause to address an initial hurdle that Johnson must clear to have its case heard in federal court: administrative exhaustion. Although we have jurisdiction under 30 U.S.C. § 1276(a)(2) to review the Secretary's termination of the cessation order, we still must ensure that Johnson exhausted its claims at the administrative level before we consider them. *S. Ohio Coal Co. v. Office of Surface Mining, Reclamation & Enf't, Dep't of Interior*, 20 F.3d 1418, 1425 (1994); *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1090–91 (6th Cir. 1981). That's because, as we have previously held, "SMCRA unambiguously requires resort to the prescribed administrative review process before" a party may seek judicial review. *S. Ohio Coal Co.*, 20 F.3d at 1425.

The exhaustion inquiry in this case centers on whether the ALJ decision before us is a final decision. A claim is administratively exhausted if it results in a "final decision . . . subject to judicial review." *Willis v. Sullivan*, 931 F.2d 390, 397 (6th Cir. 1991). Elkhorn argues that the ALJ decision does not fit that bill because, under SMCRA implementing regulations, only a decision rendered by the Appeals Board, and not an ALJ, constitutes a final decision. Johnson acknowledges that, normally, only decisions by the Appeals Board are final but says that an exception to that rule makes the ALJ decision in this case a final one. We agree with Johnson.

Congress may define what constitutes a final decision. *Weinberger v. Salfi*, 422 U.S. 749, 766–77 (1975). Or, it may delegate that task to the agency itself. *Id.* Congress does not

define finality in the text of SMCRA, so the Secretary fleshes out its meaning through regulations. Those regulations provide a general finality definition that makes only decisions of the Appeals Board "final . . . agency action subject to judicial review . . . ." 43 C.F.R. § 4.21(c), (d). But the regulations also contain a narrow carve-out to that general rule. The carve-out is triggered if, simultaneous to filing an appeal with the Appeals Board, the litigant petitions for a stay of the ALJ decision until the appeal is resolved. *Id.* § 4.21(a)(2). In that case, if the Appeals Board denies or "fails to act on the petition" to stay "within 45 calendar days of the" appeal deadline, then the ALJ decision becomes a "final" decision "subject to judicial review." *Id.* § 4.21(a)(3), (b)(4), (c).

That carve-out has straightforward application here. Johnson timely appealed the ALJ's ruling to the Appeals Board and simultaneously asked the Board to stay the ALJ's ruling until it resolved the appeal. Forty-five days after Johnson's appeal deadline, the Appeals Board still had not answered Elkhorn's request for a stay. At that point, the ALJ's decision, even though pending appeal before the agency, became "final," according to 43 C.F.R. § 4.21(c).

Although § 4.21(c) seems to have obvious application to this case, Elkhorn contends that it is the wrong place to look and urges the court to turn to § 4.1101(a) instead. That section vests the Appeals Board with "authority to exercise the final decisionmaking power of the Secretary under the act . . . ." 43 C.F.R. § 4.1101(a). Because only the Appeals Board possesses "final decisionmaking power," Elkhorn's argument goes, only the Appeals Board, and not an ALJ, can issue a final decision subject to judicial review. But the fact that the Appeals Board possesses final decisionmaking power does not mean an ALJ may never issue a final decision. SMCRA regulations allow the Appeals Board to exercise its final decisionmaking power with discretion. If the Appeals Board stays an ALJ decision pending appeal, then it assumes responsibility for issuing a final, judicially reviewable decision. On the other hand, according to § 4.21(c), if the Appeals Board denies or declines to act on a simultaneously filed stay petition within the prescribed forty-five-day window, then it has effectively "decided" that the ALJ opinion will be the final, judicially reviewable decision. That is exactly what happened here.

Even so, Elkhorn asserts that *Shawnee* and *Southern Ohio* expressly hold that only decisions from the Appeals Board are final. Yet Elkhorn misrepresents the holdings of those

cases. *Shawnee* and *Southern Ohio* simply state that SMCRA mandates exhaustion. *See S. Ohio Coal Co.*, 20 F.3d at 1425; *Shawnee*, 661 F.2d at 1091. They do not say, however, when a decision becomes final and SMCRA's exhaustion requirements are met. But SMCRA regulations do. And they make clear that the ALJ's decision in this case became final once the Appeals Board declined to act on Johnson's stay petition within forty-five days of the appeal deadline. 43 C.F.R. § 4.21(c). Johnson therefore exhausted its administrative remedies to the extent required by SMCRA.

## IV.

Satisfied that Johnson has cleared this exhaustion hurdle, we move to the merits of its claims against Elkhorn. Johnson says the ALJ's affirmance of the Secretary's termination of the cessation order was arbitrary, capricious, or inconsistent with law for three main reasons: (1) the Secretary and the ALJ erroneously concluded that subsection (C) allows the Kentucky Cabinet to issue surface mining permits in reliance on Kentucky's cotenancy law[3]; (2) when the Kentucky Cabinet issued Elkhorn's revised permit over Johnson's objections it unlawfully adjudicated a "property rights dispute" in violation of 30 U.S.C. § 1260(b)(6)(C); and (3) the Kentucky Cabinet should have withheld Elkhorn's permit under 30 U.S.C. § 1257(b)(9), because Elkhorn failed to disclose on its revised application the existence of Johnson's still-pending lawsuit, *Johnson I*. We address each argument in turn.

## A.

The Secretary terminated its cessation order after concluding that Elkhorn's amended permit complied with the statutory requirements set out in subsection (C). And the ALJ upheld that decision after determining that subsection (C) allows a regulatory authority to turn to any state law to assess whether a permit applicant has submitted documents demonstrating it has a

---

[3]Johnson also argues that Kentucky's regulatory analogue to subsection (C), 405 Ky. Admin. Regs. 8:030 § 4(2)(c), likewise prohibits reliance on Kentucky's cotenancy law. But the Kentucky regulation is not relevant to our review of the Secretary's decision to terminate the cessation order. The Secretary's decision was based on the conclusion that Elkhorn's permit complied with SMCRA's permitting requirements. This case, therefore, deals only with the Secretary's interpretation of SMCRA and not the Kentucky regulation. Johnson could have challenged the Cabinet's permitting decision as inconsistent with Kentucky's regulations. AR 0134; *see* Ky. Rev. Stat. Ann. § 350.0301(1). It chose to challenge the Secretary's decision instead. The Secretary's decision, then, is the only decision we review.

right to surface mine.  Under that reading of the provision, the ALJ explained, the Cabinet was permitted to rely on Kentucky's law of cotenancy to approve Elkhorn's permit.  Johnson argues that subsection (C) is narrower, permitting the Cabinet to consider only state-law rules of construction for interpreting severance conveyances that do not expressly grant a right to surface mine.[4]

We agree with the Secretary that subsection (C) permits the Cabinet to rely on any state law in making its permitting decision.  Therefore, the ALJ's application of Kentucky cotenancy law, instead of the state's rules of construction for vague severance deeds, to uphold the issuance of Elkhorn's permit and the Secretary's termination of the cessation order was not arbitrary, capricious, or contrary to law.

## 1.  Subsection (C)

Our interpretation of subsection (C) begins and ends with the provision's text.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  Subsection (C) states:

> If the conveyance does not expressly grant the right to extract coal by surface mining methods, the surface-subsurface legal relationship shall be determined in accordance with State law . . . .

30 U.S.C. § 1260(b)(6)(C).  On its face, the text does not limit the source of state law that a regulatory authority may consult to make a permitting decision.  It simply instructs the regulatory authority to determine the surface-subsurface legal relationship of an estate "in accordance with State law."  Read naturally, the unmodified phrase "State law" embraces the use of *any* state law.  *Cf. Levin v. Miss. River Fuel Corp.*, 386 U.S. 162, 168 (1967) ("In using the language 'required under applicable State law,' § 5(11) [of the Interstate Commerce Act] embraced all state law . . . .").  That includes the full range of a state's "legislation, judicial precedents, and accepted legal principles," *Black's Law Dictionary* 1015 (10th ed. 2014), not only state-law rules for interpreting severance conveyances.

---

[4]The specific rule of construction that Johnson believes applies here comes from the Broad Form Deed Amendment to Kentucky's Constitution.  That amendment provides that severance deeds that do not expressly grant a right to surface mine must be interpreted to allow "coal extraction by only the . . . methods . . . commonly known to be in use . . . at the time the instrument was executed."  *Johnson v. Cabinet*, 289 S.W.3d at 221 (quoting Ky. Const. § 19(2)).  Because surface mining was not commonly in use at the time the severance conveyances connected to Tract 46 were executed, they do not grant a right to surface mine under the Amendment.

Johnson reads subsection (C) differently. Under Johnson's interpretation, the provision unambiguously allows the regulatory authority to turn to state law only for determining the surface-subsurface legal relationship as defined by the severance conveyance and not any other document. Arriving at that interpretation, however, requires several feats of textual acrobatics that only contort a straightforward text.

Johnson's first maneuver misconstrues the relationship between subsection (C)'s two clauses. According to Johnson, the first clause announces a purpose that informs the meaning of the second clause. And because the first clause references "the conveyance," Johnson says that its purpose is to provide a method for interpreting a severance conveyance. That means, Johnson contends, that the "surface-subsurface legal relationship" in the second clause is a legal relationship that may only be defined by a severance conveyance—and, therefore, the only relevant "State law" is that which helps the regulatory authority construe the severance conveyance.

But that argument mischaracterizes the function of subsection (C)'s first clause. The clause is a classic conditional statement. As a conditional statement, rather than announcing the purpose of the entire subsection, it simply limits the subsection's applicability. When, according to the conditional statement, does subsection (C) apply? Only "if the conveyance does not expressly grant a right to surface mine." And what does the regulatory authority do when that condition is met? The remainder of subsection (C) tells us: the regulator determines "the surface-subsurface legal relationship . . . in accordance with State law." No portion of subsection (C)'s text limits the realm of documents the regulatory authority may consult to make that state-law determination. Thus, any document that state law deems relevant—whether the severance conveyance, a right of entry lease, or otherwise—may inform the regulatory authority's permitting decision under subsection (C).

Johnson's second syntactical stunt attempts to rely on the canon of harmonious reading. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole." (internal citations omitted)). Johnson posits that the only way to read subsections (A), (B), and (C) harmoniously is to interpret subsection (C) as

requiring the application of state law to the severance conveyance. In support of that view, Johnson emphasizes that subsections (B) and (C) both mention a conveyance, whereas subsection (A) only discusses consent. The way Johnson sees it, this difference in language indicates that Congress intended to provide only two methods of establishing a right to surface mine: by a conveyance or by consent. The only difference between subsections (B) and (C), Johnson contends, is that the latter "merely specifies the choice of law when interpreting rights that are not explicit in the [conveyance]." Appellant Br. 31.

Reading the subsections harmoniously, however, does not mandate such a narrow interpretation of subsection (C). An equally harmonious interpretation is that when an applicant has neither the consent of all surface owners, as allowed under subsection (A), nor an express conveyance, as allowed under subsection (B), it may establish a right to surface mine through any other method "in accordance with State law" under subsection (C). That interpretation does not create any inconsistencies between the three subsections.

Finally, Johnson urges that reading subsection (C) too broadly renders subsection (A) superfluous. That is, if subsection (C) allows resort to Kentucky cotenancy law, which authorizes surface mining based on the consent of fewer than all surface owners, then subsection (A)'s complete-consent requirement no longer plays any role whatsoever in a state's permitting determinations. That argument also fails to carry the day. Even Johnson acknowledges that not every state allows one tenant to surface mine over a cotenant's objections. Appellant Br. 34. It may be true that, as a practical matter, subsection (A) plays a diminished role in Kentucky. But we do not read nationally applicable statutes through a single-state lens.

In fact, SMCRA's national application in a domain traditionally controlled by the states is just one more reason to interpret subsection (C) broadly, allowing consideration of any state law to determine whether the surface-subsurface legal relationship includes a right to surface mine. Because "'property' and 'interests in property' are creatures of state law," *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992), we should expect a "'clear and manifest' statement from Congress" that it intended to preempt certain state property laws governing the right to surface mine before interpreting SMCRA as doing so, *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (citation omitted). There is no "clear and manifest" statement of such intent in this case. To be sure, as

Elkhorn points out, SMCRA's "cooperative federalism" framework is designed to impose on states more restrictive regulations governing the practice of surface mining, in part to protect the rights of landowners. *See* 30 U.S.C. § 1202(b) (listing as another purpose "assur[ing] that the right of surface landowners . . . are fully protected from [surface mining] operations"). But that is just one purpose the Act furthers. The statute lists twelve more, including "encourag[ing] the full utilization of coal resources," *id.* § 1202(k), and assuring "that the coal supply essential to the Nation's energy requirements . . . is provided," *id.* § 1202(f). That Congress also listed protecting landowners among those purposes does not prove that it unequivocally intended to override some state property laws—but not others—governing rights of entry. *Cf. Crow Tribe of Indians v. Peters*, 835 F. Supp. 2d 985, 992 (D. Mont. 2011) ("[B]oth SMCRA and its implementing regulations make clear that nothing in the surface owner protections are to be construed as increasing or diminishing any property rights.").

The text of subsection (C), then, is quite clear: when a conveyance does not expressly grant the right to surface mine, the regulatory authority may rely on any state law to determine whether the documents describing the surface-subsurface legal relationship of the severed estate grant such a right. Because subsection (C) is plain and unambiguous, our analysis ends where it began: with the statutory text. *Robins*, 519 U.S. at 340. We need not consider Johnson's lengthy citations to conflicting legislative history. *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."). And we need not defer to the Secretary's own interpretation of the text (although we note that doing so in this case would yield the same result). *Chevron*, 467 U.S. at 844 (holding that when a statute is ambiguous, the court "may not substitute its own construction . . . for a reasonable interpretation made by the . . . agency").

## 2. The ALJ's Decision

The ALJ, arriving at the same interpretation we do, found Kentucky's cotenancy law applicable to Elkhorn's permit and concluded that Elkhorn's permit was issued in accordance with cotenancy law outlined by a Kentucky appellate case, *Johnson v. Cabinet*, 289 S.W.3d 216 (Ky. Ct. App. 2009). Therefore, the ALJ held that Elkhorn's revised permit was valid under subsection (C) and upheld the Secretary's decision to terminate the cessation order. The ALJ's

application of the cotenancy law outlined by *Johnson v. Cabinet* was not arbitrary, capricious, or contrary to law. *See* 30 U.S.C. § 1276(a)(2).

In *Johnson v. Cabinet*, the Kentucky court of appeals ruled that "a cotenant ha[s] the right to begin strip mining operations on . . . property despite objections from another cotenant." *Johnson v. Cabinet*, 289 S.W.3d at 220. That holding derived from the common law principle that "[a] cotenant may use and enjoy a common estate in real property in the same manner as if he or she were the sole owner." *Id.* at 219 (citing *York v. Warren Oil & Gas Co.*, 229 S.W. 114 (Ky. 1921)). Applying that principle, *Johnson v. Cabinet* determined that a right of entry lease executed between only one surface tenant and a coal mining company demonstrated that the coal company had a right to surface mine even over other surface tenants' objections. *Id.* at 220.

The ALJ was not wrong to apply that precedent to this case. Here, just like the coal company in *Johnson v. Cabinet*, Elkhorn established its right to enter and surface mine by relying on a right of entry agreement with one of the plot's surface owners, Pike Letcher. And here, just as in *Johnson v. Cabinet*, some surface owners objected to surface mining. There is no meaningful difference between *Johnson v. Cabinet* and this case that would make Kentucky's law of cotenancy applicable there but not here.

Johnson's counterargument is unconvincing. Johnson argues that Kentucky's law of cotenancy only "defines the surface-surface legal relationship rather than the surface-subsurface legal relationship, as mandated by [subsection (C)]." Appellant Br. 23. When it comes to the surface-subsurface legal relationship, Johnson again asserts, only the severance conveyance controls—and that means that the only relevant state law is that which guides the regulatory authority's interpretation of the severance conveyance. But *Johnson v. Cabinet* considered and expressly rejected the same argument by the nonconsenting cotenants there. The court explained that, in Kentucky, the law "does not make a distinction between surface and mineral interests when construing the mutual rights, duties and liabilities of cotenants"—the general rules of cotenancy "carr[y] over into the field of minerals, which are simply part of the land." 289 S.W.3d at 220–21 (discussing cases). Moreover, Kentucky's rules regarding the interpretation of severance conveyances, *Johnson v. Cabinet* explained, "did not change in any fundamental way the long-standing law of cotenancy." *Id.* at 221 (citation omitted). The court

concluded that when an applicant to surface mine based its right to do so on a surface lease agreement, and not a severance conveyance, Kentucky cotenancy law applied. Elkhorn itself based its right to surface mine on its surface entry agreement with Pike Letcher rather than any severance conveyance. Therefore, according to *Johnson v. Cabinet*, the State's cotenancy laws govern. Johnson thus fails to show that the ALJ's application of Kentucky cotenancy law in its review of the Secretary's termination decision was arbitrary, capricious, or contrary to law.

**B.**

SMCRA places an important limitation on a regulatory authority's power: in the course of reviewing permit applications, the regulatory authority may not "adjudicate property rights disputes." 30 U.S.C. § 1260(b)(6)(C). Johnson asserts that the Cabinet and the Secretary violated this restriction by approving Elkhorn's revised permit application in spite of Johnson's objections to Elkhorn's right to surface mine. According to Johnson, because of its ongoing objection to Elkhorn's right, SMCRA implicitly required Elkhorn to obtain a final, unappealable state court judgment affirming that it had a right to surface mine under state law before obtaining a permit. The ALJ and district court both rejected that argument. So do we.

SMCRA's prohibition against adjudicating a property rights dispute appears at the end of its list of potential ways an applicant may establish a right to surface mine on a severed estate. The end of that list begins with a (now-familiar) command and ends with the important property-rights-dispute caveat. It reads: "[I]f the conveyance does not expressly grant the right to extract coal by surface mining methods, the surface-subsurface legal relationship shall be determined in accordance with State law: *Provided*, That nothing in this chapter shall be construed to authorize the regulatory authority to adjudicate property rights disputes." 30 U.S.C. § 1260(b)(6)(C) (underline added).

SMCRA does not define what constitutes "property rights disputes." Johnson argues that the phrase covers any disagreement over an applicant's right to surface mine, including Johnson's disagreement over the range of applicable state law under subsection (C). But that interpretation of the phrase is too broad. The restriction against adjudicating property rights disputes operates as an exception from the general mandate that the regulatory authority

determine whether a permit applicant has established that it has a right to surface mine. *See* 64 Fed. Reg. 70766, 70807–08 (Dec. 17, 1999) (adopting the reasoning from two Eastern District of Kentucky cases holding that the regulatory authority has an obligation to "administratively ascertain that a prima facie showing of the right to surface mine under state law has been properly documented by the applicant" (citations omitted)). As an exception to that general mandate, it should be construed narrowly. *Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("[W]e usually read [an] exception narrowly in order to preserve the primary operation of the provision.").

A few court cases and administrative decisions provide an appropriately narrow description of the "property rights disputes" encompassed by SMCRA. Those cases conclude that such disputes challenge the validity or interpretation of a conveyance, the location of a parcel's boundary lines, allegations of waste or ouster, or other disagreements related to ownership over the land. *See Akers v. Baldwin*, No. 84-88, Findings of Fact, Conclusions of Law and Order at 12 (E.D. Ky. Feb. 28, 1985), R. 64-3, PID 745 (property rights disputes over which the Cabinet lacks jurisdiction are those dealing with "whether any given conveyance had been obtained by fraud, whether the consent obtained was signed by the proper heirs to a particular tract of land, whether there was a boundary line or other dispute concerning the realty's description, and other such individualized matters"); *Akers v. Bradley*, No. 84-88, Opinion, Order and Judgment 2 (E.D. Ky. June 20, 1988), R. 64-6, PID 752 (reiterating the definition in *Baldwin*); *Foster E. Sword*, 138 IBLA 74, 81 (Feb. 3, 1997) (describing a disagreement over the location of a property boundary line as "a property title or rights dispute[]" that the Cabinet cannot resolve); *Paul F. Kuhn*, 120 IBLA 1, 9 (July 3, 1991) (concluding that a dispute over proper surveying reference points for demarcating property boundary lines is "clearly a property dispute" outside the Cabinet's jurisdiction); *Johnson v. Cabinet*, 289 S.W.3d at 221–22 (listing lawsuits alleging ouster or waste among the types of "property rights" disputes over which the Kentucky Cabinet has no jurisdiction (citations omitted)); *Dep't for Nat. Res. & Env't Prot. v. Stearns Coal & Lumber Co.*, 563 S.W.2d 471, 473 & n.4 (Ky. 1978) (emphasizing that disputes over the proper interpretation of a deed are proper for Kentucky state courts and not for the Cabinet to resolve).

Johnson's objection to Elkhorn's permit does not fit within that narrow category of property rights disputes. Johnson does not contest the validity of any deed connected to Tract 46 or the right of entry agreement between Pike Letcher and Elkhorn. Instead, Johnson contests the Cabinet's application of settled Kentucky cotenancy law to Elkhorn's permit and the Secretary's affirmance that the Cabinet's application of that law was consistent with the requirements of subsection (C). Moreover, Johnson actually concedes that under Kentucky cotenancy law Elkhorn's right of entry agreement gives it a right to surface mine. Appellant Br. 20. Nonetheless, Johnson argues that the text of subsection (C) makes cotenancy law irrelevant. That is a dispute over statutory interpretation, not property rights.

What is more, Johnson's assertion that the Cabinet must withhold a permit until every possible dispute between landowners is resolved by a final, unappealable state court judgment is unsupported (as Johnson acknowledges) by SMCRA's express requirements. The cases Johnson cites do not support that position either—unlike this one, those cases dealt with bona fide property rights disputes. In the first case, the applicant's right to surface mine was subject to a dispute over the questionable validity of the applicant's surface lease. *Ky. S. Coal Corp. v. Ky. Energy & Env't. Cabinet* ("*KSCC*"), 396 S.W.3d 804, 805–07 (Ky. 2013) (finding that a bona fide property rights dispute existed when the applicant's right of entry agreement expired while its application was pending, and it was unclear how a prior state court judgment affected the expiration of the mining rights contained in the lease). In the second case, the right to surface mine hinged on the proper interpretation of an ambiguous deed. *Marion Taylor*, 125 IBLA 271 (Feb. 14, 1993), *vacated*, *Coal-Mac, Inc. v. Babbitt*, Case No. 7:93-cv-00117-JMH, R. 48, at 272 (E.D. Ky. Aug. 9, 1995) (concluding that a bona fide property rights dispute existed over whether a deed's grant of "all mining rights" to the mineral owner included the right to surface mine). Here, however, there is no quarrel over the validity or interpretation of the right of entry agreement between Elkhorn and Pike Letcher. Consequently, neither *KSCC* nor *Marion* help Johnson's efforts to fit this case within the category of "property rights disputes" that must be resolved in state court before the regulatory authority may issue a permit to surface mine.

Finally, it is worth noting the types of property rights claims Johnson could have raised in the appropriate tribunal but did not. Johnson could have asserted in state proceedings that

*Johnson v. Cabinet* was incorrectly decided, but it declined to do so. Ky. Rev. Stat. Ann. § 350.0301(1). Johnson likewise refrained from initiating a state-court action alleging waste, seeking a partition, or pursuing other forms of relief from Elkhorn's surface mining activities. *See Johnson v. Cabinet*, 289 S.W.3d at 221–22; *Kelley v. Kelley*, No. 2010-CA-000831-MR, 2011 WL 6412079, at *1 (Ky. Ct. App. Dec. 22, 2011). Those actions would fall within the realm of property rights disputes that the Cabinet and the Secretary have no authority to resolve. Johnson's dispute over the proper interpretation of SMCRA does not.

For all these reasons, it was not arbitrary, capricious, or contrary to law for the ALJ to conclude that neither the Cabinet nor the Secretary adjudicated a property rights dispute when they approved Elkhorn's revised permit and terminated the cessation order, respectively.

**C.**

Johnson's final claim has to do with one of SMCRA's disclosure requirements. Every applicant for a permit to surface mine must inform the regulatory authority whether its "legal right to enter and commence surface mining operations . . . is the subject of pending litigation." 30 U.S.C. § 1257(b)(9). Johnson says Elkhorn violated that disclosure rule because it omitted the pending *Johnson I* suit from its revised application for a permit. In its revised application, Johnson submitted a standard form that asks the applicant whether "any rights to enter and mine the area, as claimed by the applicant, [are] subject to any pending litigation." AR 0825-1642. Johnson answered, "N/A." *Id.* Of course, at the time Elkhorn submitted its revised application, the *Johnson I* suit was still (indeed, is still) pending in federal court. So, Johnson asserts, Elkhorn should have listed the suit on its application, and its failure to do so made the application inaccurate and incomplete. Therefore, Johnson contends, the Cabinet could not have lawfully issued Elkhorn's permit, because SMCRA allows it to issue a permit only upon finding that "the permit application is accurate and complete . . . ." *Id.* § 1260(b)(1). We are unconvinced.

To start, it is doubtful that the *Johnson I* litigation is the kind of "pending litigation" that is subject to SMCRA's disclosure requirements. The district court concluded, albeit without explanation, that the purpose behind SMCRA's disclosure rule is to keep the Cabinet from unlawfully adjudicating a property rights dispute. The parties (including Johnson) seem to

assume the correctness of that proposition, although they likewise fail to cite any supporting authority.  If that really is its purpose, then Elkhorn had no duty to disclose the pending lawsuit on its application, because the lawsuit is not a property rights dispute.

Yet even if Elkhorn was required to disclose the lawsuit on the application, its failure to do so was harmless error.  *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997) ("[T]his court applies a harmless-error rule to APA cases, such that a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination." (citation omitted)); *see also* 5 U.S.C. § 706 (stating that judicial review of agency action shall take "due account . . . of the rule of prejudicial error").  That is because all parties, including the Cabinet and the Secretary, were aware of the ongoing litigation in *Johnson I*.  The Cabinet's actual knowledge means that it had the opportunity to withhold Elkhorn's permit if it believed the suit's existence undermined Elkhorn's eligibility for a permit to surface mine.  And the Secretary could have refused to terminate the cessation order if it concluded the Cabinet issued Elkhorn's permit in violation of SMCRA's disclosure provision.  Accordingly, even assuming Elkhorn should have indicated on its revised application that *Johnson I* remained pending, its failure to do so was harmless error and therefore cannot justify undoing the ALJ's decision.

## V.

Finally, the Kentucky Cabinet, acting as Amicus Curiae, raises a host of additional arguments that it says go to this court's subject matter jurisdiction over the case.  In fact, none of the Cabinet's arguments raise jurisdictional concerns.  Briefly, the Cabinet first argues that the court has no authority to review the Secretary's decision to terminate the cessation order or to compel the Secretary to re-issue the order.  But SMCRA allows for judicial review of any of the Secretary's orders or decisions, including decisions concerning the issuance, modification, or termination of cessation orders.  30 U.S.C. § 1276(a)(2); *id* § 1275.  Hence, the court does have jurisdiction to review the termination decision here.  The Cabinet also asserts that Johnson's appeal amounts to an improper collateral attack on Kentucky's permitting decision and, by extension, the State's SMCRA-implementing regulations.  But Johnson does not ask the court to review the Cabinet's decision to issue the permit pursuant to its own regulations; rather, it asks

us to review the Secretary's determination that the permit complied with SMCRA.  For that reason, we address SMCRA's statutory requirements only, and leave any differences in the Kentucky permitting requirements for another court on another day.  Finally, the Cabinet takes issue with the Secretary's issuance of the cessation order in the first instance, arguing that in issuing it the Secretary did not comply with SMCRA's procedural requisites.  Whatever the merits of that argument, it has no bearing on jurisdiction.  And because it was not "raised below" or "advanced in this court by any party," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 721 (2014), we decline to address it.

**VI.**

For the foregoing reasons, we **AFFIRM**.